UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY SERVICES, INC.,

                    Plaintiff,                              No. 08-CV-14406-DT

vs.                                                         Hon. Gerald E. Rosen

WILLIAM MARZULLO,

                    Defendant.
_____/

OPINION AND ORDER REGARDING PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

                  At a session of said Court, held in
                  the U.S. Courthouse, Detroit, Michigan
                  on ____November 20, 2008_____

                  PRESENT:   Honorable Gerald E. Rosen
                                    United States District Judge

I. INTRODUCTION

        This breach of contract/misappropriation of trade secrets action is before the Court

on Plaintiff Kelly Services, Inc.'s motion for temporary restraining order and preliminary

injunction.  At issue is Defendant William Marzullo's alleged breach of a Non-

Competition Agreement and a Confidentiality and Non-Solicitation Agreement

(collectively referred to herein as the "Employment Agreements") he entered into with

Kelly Services during the course of his employment with the company.  Defendant has

responded to Plaintiff's Motion.  Having reviewed and considered the parties' briefs and

1

supporting documents, and post-hearing supplemental briefs,[1] and having heard the oral

arguments of counsel, the Court is now prepared to rule on this matter.  This Opinion and

Order sets forth the Court's ruling.

## II. FACTUAL BACKGROUND

Plaintiff Kelly Services, Inc. is a staffing services company headquartered in Troy,

Michigan that specializes in providing a wide range of employment staffing and

consulting services on a national basis, including, but not limited to, outsourcing,

recruitment, recruitment process outsourcing, temporary staffing services, vender on-site

and full-time placement, and consulting services.  Defendant William Marzullo is a

former employee of Kelly Services.  Marzullo was employed with Kelly from June 1,

1998 through August 7, 2008.  At the time of his resignation, Marzullo held the position

of Regional Manager/Vice President for Kelly out of its Dallas, Texas office, a position

to which he was promoted in 2006.  (Prior to that position, Marzullo was an Area

---

[1] Defendant filed a "Post Submission Brief" on November 13, 2008.  In response, on November 14, 2008, Plaintiff filed a "Motion to Strike Defendant's Post Submission Brief or, in the alternative, for Leave to File a Surreply." Plaintiff attached to this Motion a proposed Surreply Brief.  *See* Motion to Strike, Ex. A.  As Plaintiff correctly notes in its Motion to Strike, neither the Federal Rules nor the Local Court Rules provide for the filing of anything more than a brief in support of a motion, a response brief, and a reply brief.  However, because this case presents nuanced areas of non-forum law, the Court appreciates the post-hearing briefs submitted by the parties.  Therefore, notwithstanding Defendant's failure to seek leave to file his "Post Submission Brief," the Court will DENY Plaintiff's Motion to Strike and, instead, GRANT Plaintiff's alternative Motion for Leave to File a Surreply.  Accordingly, the Court accepts as properly filed both Defendant's "Post Submission Brief" and the Surreply Brief, filed as an attachment to Defendant's Motion to Strike.

Manager,[2] as well as a Branch Manager.)

In his position as Regional Manager/Vice President, Marzullo was responsible for servicing Kelly's customers, maintaining, cultivating and creating customer and prospective customer relationships, developing business, supporting corporate initiatives and meeting corporate goals, regional strategic business planning, sales, operations, employee growth and development and recruiting and marketing candidates, both full-time Kelly employees and contract employees. The market area in which Marzullo worked and had responsibilities since 2004 covered the entire State of Texas. Further, in his position, Marzullo was exposed to Kelly's confidential and proprietary business information throughout the company's Central Region, which included the major markets in Texas -- Dallas and Houston.

At the time of his original hire, in 1998, Marzullo signed Kelly's "Agreement with Full-Time Employees of Kelly Corporations." [Supplemental Affidavit of Kristin Supanich, Kelly Service's Vice President and Division Manager for Strategic Markets Central, Ex. 1.] This Original Agreement provided, in relevant part, as follows:

> In order to provide the highest quality service to its customers and maintain its leadership position in the temporary help industry, Kelly Services spends substantial time, effort and money in recruiting and training its employees, and developing programs and services to met its customers' needs. All Kelly employees have an obligation to help protect this investment.

---

[2] Marzullo worked within the State of Michigan from March 2001 through July 2004 when he held the position of Area Manager.

* * *

       In consideration of my employment with Kelly Services, Inc., Kelly Assisted Living Services, Inc., or any other Kelly corporation ("Kelly"), I agree as follows:

(1) Unless required by my job at Kelly, I will never disclose, use, copy or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers or Kelly's suppliers. This includes customer and employee lists, sales, service, recruiting and training techniques and manuals, sales and marketing strategies; computer programs; financial data and other similar information.

(2) While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, [more than 2%] stockholder [of any publicly traded company], [more than 2%] investor [in the stock of any publicly traded company], agent or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the last five years of my employment with Kelly.

[Supanich Supp. Aff., Ex. 1.]

       In or about July 2004, Marzullo was promoted to the position of Regional Manager out of Kelly's Dallas, Texas office. Then, as indicated, in June 2006, Marzullo's title and responsibilities were further elevated to Regional Manager/Vice President.

       Given Marzullo's high-ranking position, his increasing development and exposure to Kelly's clients, and access to Kelly's confidential and trade secret business information, in conjunction with a merit pay increase of $4,000, in June 2007, Marzullo signed a Non-Competition Agreement and a Confidentiality and Non-Solicitation

4

Agreement. [*See* Supanich Supp. Aff., ¶ 9.] These June 2007 Agreements clarified and, in some ways, narrowed, the scope of the non-compete and non-solicitation/ confidentiality obligations contained in Marzullo's original employment agreement. Pursuant to the June 2007 Non-Competition Agreement, Marzullo agreed that he would not compete, for a period of 12 months following his resignation, in any state in which he had any responsibility, or conducted any business, on behalf of Kelly in the three years prior to his termination of employment.[3]  In relevant part, the Non-Competition Agreement provided as follows:

> 2.  Confidential Information.  I agree and acknowledge that during my employment, I will be exposed to confidential and proprietary information and trade secrets of the Company.  The confidential and proprietary information and trade secrets include, but are not limited to, the Company' customer lists, operational procedures, marketing and sales strategies and practices, pricing information, margin information, markup information, prospect lists, customer and prospect needs and preferences information, prospective employees, employee lists, employee capabilities matrices, employee training information and practices, and the methods of operation of the Company as they exist from time to time (the "Confidential Information").

> 3.  Restrictive Covenants..  In order to preserve the confidentiality of the Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect the Company's customer relationships, with both its potential and existing customers, its customer goodwill, and to protect the Company from improper or unfair competition, **I agree that during my employment and for a period of 12 months from the date my employment terminates, for any reason, whether such termination is**

---

[3]  As indicated, the Original Agreement provided that Marzullo would not solicit any Kelly customers or compete with Kelly for a period of one year "in any market area in which [he] worked or had responsibility during the last **five** years of [his] employment with Kelly."

**voluntary or involuntary, I will not directly or indirectly:**

    a. <u>Non-Competition</u>. **Participate in the ownership or control of, act as an employee, agent, or contractor of, or provide any services to, or for, any business that is engaged in the employee staffing and consulting services business, which includes, but is not limited to, direct placement, outplacement, outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, management services, vendor on-site, vendor management, and consulting services, or engage in any activity that is competitive with the Company, in any State within the United States, in which I had any responsibility, or conducted any business, on behalf of the Company in the three years prior to my termination of employment with the Company**. Notwithstanding anything to the contrary contained in this Agreement, the Company agrees that I may own up to two (2%) of the outstanding shares of the capital stock of a company whose securities are registered under Section 12 of the Securities Exchange Act of 1934.

[Plaintiff's Ex. A.]

Pursuant to the Confidentiality and Non-Solicitation Agreement, Marzullo agreed that (1) he would not improperly use or disclose Kelly's confidential information or trade secrets, and (2) he would not solicit any Kelly customers, potential customers, or employees for a period of 12 months following his resignation. The Non-Solicitation Agreement provides, in relevant part:

    3. <u>Restrictive Covenants</u>. In order to preserve the confidentiality of the Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect the Company's customer relationships, with both its potential and existing customers, its customer goodwill, and to protect the Company from improper or unfair competition, **I agree that during my employment and for a period of 12 months from the date my**

6

**employment terminates, for any reason, whether such termination is voluntary or involuntary, I will not directly or indirectly:**

a. <u>Non-Solicitation of Company Employees.</u> Solicit, divert, or attempt to solicit or divert from the Company any employee or any person providing services to, or on behalf of, the Company or influence any such person to no longer serve as an employee or provide services to, or for, the Company; and

b. <u>Non-Solicitation of Company Customers or Potential Customers</u>. Solicit, divert, or attempt to solicit or divert from the Company, any work or business related to the employee staffing and consulting services business, which includes, but is not limited to, direct placement, outplacement, outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, management services, vendor on-site, vendor management, and consulting services whatsoever from any client or customer, or potential client or customer, of the Company for either myself or any other entity that may employ, engage or associate with me in any fashion.

For the purposes of this Agreement, "client(s)" or "customer(s)" of the Company, shall mean any individual, corporation, limited liability company, partnership, proprietorship, firm, association, or any other entity that I have actually sold or delivered any services to, or to which I have been exposed through Company meetings or marketing efforts, during the 12 months preceding my termination from the Company's employ, and "potential client(s) or customer(s)" shall be any individual, corporation, limited liability company, partnership, proprietorship, form, association or any other entity that I have contacted, orally, in writing or in person, to solicit, sell and/or deliver services to, or to which I have been exposed through Company meetings or marketing efforts, during the 12 months preceding the date of my termination from the Company's employ. I will inform the Company of prospective business opportunities.

[Plaintiff's Ex. B.]

Both of these Employment Agreements contain Michigan choice of law provisions and in executing the Agreements, Marzullo consented to jurisdiction in Michigan. *See* Plaintiff's Ex. A, ¶¶ 10, 11; Ex. B, ¶¶ 12, 13.[4]

Marzullo resigned his position with Kelly Services effective August 7, 2008. At his exit interview with Tyler Eash, Kelly's Senior Director of Human Resources for U.S. Commercial Resources, Marzullo was reminded of his obligations under the Agreements. Marzullo indicated that he was going to go to work for a division of Roth Staffing Companies, LP, -- a competitor of Kelly Services -- where he would be responsible for its West Coast operations. According to Eash, Marzullo stated that, although the West Coast operations normally included Dallas, Texas, he would not have responsibility for Dallas, given his non-compete obligations under the Kelly Agreements.[5] Further, according to Eash, Marzullo stated that he would have to move from his home in Dallas, to either Orange County, California or Colorado for his new position at Roth.

Contrary to Marzullo's representations, however, Kelly recently discovered that Marzullo is not only working for Roth, but is also still living and working in Dallas, Texas and, at a minimum, is responsible for Roth's Dallas, Texas territory. Marzullo's profile posted on the website www.linkedin.com, describes his position with Roth as a

_____

[4] Marzullo's original employment agreement also contained a Michigan choice of law provision.

[5] Defendant denies having represented to Eash that he would not be working in Dallas for Roth because of his non-compete agreement.

Regional Vice President with responsibilities for "cross-divisional, regional leadership/management of Ultimate Staffing Services and Ledgent (commercial, technical, and professional service lines of temporary and temp to hire staffing, and direct placement)."

Because Marzullo is performing the same services and serving the same market area that he worked in while at Kelly, and because Kelly believes that Marzullo has wrongfully used, or will inevitably use, Kelly's confidential information and trade secrets that he learned while employed with Kelly, Kelly filed the instant Complaint and Motion for Temporary Restraining Order or Preliminary Injunction.

Marzullo, however, denies having solicited business in Dallas and further states that he has not contacted any Kelly client, nor has he attempted to do so. Marzullo Affidavit, Defendant's Ex. A, ¶ 11. He also states that he has not contacted any of Kelly's employees for purposes of recruiting them to Roth, nor has he used Kelly's confidential information or trade secrets. *Id.*[6] Marzullo further asserts that the territory he is currently responsible for in the Dallas area is only four counties, which is only a fraction of the State of Texas territory he was responsible for at Kelly, and that, unlike his

_____

[6] At the November 6, 2008 hearing on this matter, Plaintiff's counsel conceded that Kelly has no evidence showing that Marzullo has improperly used or disclosed any of Kelly's confidential information, nor does it have any evidence that Marzullo has solicited any present or former Kelly clients or customers. With respect to these aspects of Marzullo's employment agreements, Kelly states that it is proceeding not under a breach of contract theory but rather under the "threatened" misappropriation of trade secrets prong of the Michigan Uniform Trade Secrets Act, M.C.L. §445.1901 *et seq.* ("MUTSA").

Kelly territory, his current Roth territory also includes the entire state of Colorado and other Western states.

## III.  DISCUSSION

A.  THE CONTRACTUAL CHOICE OF LAW PROVISION IS VALID

As an initial matter, Defendant argues that, notwithstanding the choice of law provision in the Agreements calling for application of Michigan law, Texas law should be applied in deciding this matter.  To resolve this issue, a federal court whose jurisdiction is based on diversity of citizenship must apply the conflict of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 490, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999). Thus, the Court must look to Michigan's conflict of law rules to determine whether Michigan law or Texas law governs this dispute.

Michigan has adopted the approach set forth in the Restatement (Second) of Conflict of Laws.  *See Chrysler Corp. v. Skyline Indus. Serv.*, 488 Mich. 113, 126-27, 528 N.W.2d 698, 703-04 (1995); *see also Johnson v. Ventra Group, Inc., supra*, 191 F.3d at 739; *Banek Inc. v. Yogurt Ventures, U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir.1993). According to this approach, a contractual choice of law provision will be binding unless either:

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a

fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [§ ] 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2) (1988).

In the instant action, the Employment Agreements each state that "[t]his agreement shall be governed by the laws of the State of Michigan." Therefore, to determine whether this provision should be given effect, the Court must determine whether either of the exceptions set forth in Section 187(2) apply. *Chrysler Corp. v. Skyline Indus. Serv., supra*.

In *Lowry Computer Prod., Inc. v. Head*, 984 F. Supp. 1111 (E.D. Mich. 1997), the defendant, a California resident who worked in California, argued that the court should apply California law in determining whether to enforce the non-compete provisions of his employment agreement and grant the plaintiff's motion for preliminary injunction, despite a clause in the agreement which provided that the agreement would be "governed by and enforceable in accordance with Michigan law." The court rejected the defendant's argument, and specifically found that neither of the exceptions to enforceability of contractual choice of law provisions applied.

The court determined that inasmuch as Lowry was a Michigan corporation, Michigan had a substantial relationship to the parties and the transaction. *Id.* at 1114. Additionally, the court found that "there [was] more than a reasonable basis for choosing Michigan law, namely, to ensure that Lowry will have some certainty in defending its

rights in suits with its employees all over the country." *Id.* Therefore, the exception to enforceability of the contractual choice of law provision provided in § 187(2)(a) of the Restatement did not apply. *Id.*

The *Lowry* court also found that the exception set forth in § 187(2)(b) did not apply. While the court acknowledged that California had a "strong interest" in monitoring the effects of non-compete agreements on in-state competition, it found that Michigan had an equally strong interest in protecting Michigan businesses from breaches of employment contracts and consequent losses of goodwill. *Id.* This interest, coupled with the "strong interest" the Michigan business had in the uniform interpretation of employment contracts tipped the scales in favor of Michigan law. *Id.* Further, the court found that California, at the time, did not have a fundamental policy barring all non-compete clauses. *Id.* Therefore, the court held the Michigan choice of law provision in the defendant's employment agreement was valid and enforceable. *Id.*

Similarly, in *Superior Consulting Co., Inc v. Walling*, 851 F. Supp. 839 (E.D. Mich. 1994), the plaintiff, a Michigan company, sued one of its former employees for breach of a non-compete agreement. The former employee lived and worked for plaintiff in Texas. Despite the existence of a Michigan choice of law provision, the defendant argued that Texas law should apply because Texas would be the state where the non-compete was to be enforced. *Id.* at 846. The court rejected that argument, applied Michigan law, and ultimately enforced the non-compete agreement. *Id.* at 846-48.

Defendant Marzullo argues in this case, that application of Michigan law would run contrary to a fundamental policy of the State of Texas and, thus, trigger the exception set forth in § 187(2)(b) of the Restatement. Marzullo contends that a policy disfavoring the enforcement of covenants not to compete like the Agreement at issue in this case is embodied in Texas Supreme Court decisions construing the Texas Covenants Not to Compete Act, Tex. Bus. & Com. Code § 15.50(a).

Section 15.50(a) of the Texas Business and Commerce Code provides that

[A] covenant not to compete is enforceable if it is ancillary to or otherwise part of an enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area and scope of activity to be restrained that are reasonable and do not impose a greater restraint than necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code § 15.50(a).

Texas courts have held that

[F]or a covenant to be "ancillary to or part of" an enforceable agreement under section 15.50, "(1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement."

*Alex Sheshunoff Management Services, L.P. v. Johnson and Strunk & Assoc., L.P.,* 209 S.W.3d 644, 649 (Tex. 2006) (quoting *Light v. Centel Cellular Co.*, 883 S.W.2d 642, 647 (Tex. 1994).

Marzullo argues that, under *Sheshunoff* and *Light*, because Kelly did not promise

to provide anything in exchange for his agreement not to compete, other than continued

at-will employment, the covenant not to compete here would fail under Texas law for

lack of consideration and, therefore, enforcement of the covenant under Michigan law,

would run contrary to a fundamental policy of the State of Texas.

However, issues of contract law, such as the existence of consideration, do not

necessarily implicate a strong public policy. *See* Restatement (Second) of Conflict of

Laws, § 187(2)(b), cmt. g (1971).

Comment g to Section 187 of the Restatement provides, in pertinent part:

> To be "fundamental" a policy must in any event be a substantial one.
> Except perhaps in the case of contracts relating to wills, a policy of this sort
> will rarely be found in a requirement such as the statute of frauds, that
> relates to formalities (see Illustration 6). Nor is such policy likely to be
> represented by a rule tending to become obsolete, such as a rule concerned
> with the capacity of married women (see Illustration 7), ***or by general rules
> of contract law, such as those concerned with the need for consideration***
> (see Illustration 8). On the other hand, a fundamental policy may be
> embodied in a statute which makes one or more kinds of contracts illegal or
> which is designed to protect a person against the oppressive use of superior
> bargaining power.

*Id.* (emphasis added).

Illustration 8, referenced in Comment g to Section 187, involves a similar situation

to the matter before the Court, and advises that the parties' contractual choice of law be

enforced even though applying the choice of law provision would enforce a contract that

would be invalid for lack of consideration in the state whose law would otherwise apply.[7]

---

[7] Illustration 8 is as follows:

The distinction between violation of law as opposed to violation of *policy* was explained by the court in *Shipley Co. v. Clark*, 728 F. Supp. 818 (D. Mass. 1990). That case involved a covenant not to compete which contained a Massachusetts choice of law provision and a dispute as to whether Massachusetts law or Michigan law should apply.

In *Shipley*, the defendants argued that Michigan had a strong public policy against no-compete agreements and, therefore, a Massachusetts court would not enforce the Massachusetts choice-of-law provision as to the validity of the no-compete covenants. In support of their argument they pointed to *Comshare, Inc. v. Execucom Systems Corp*., 593 F. Supp. 981 (E.D. Mich.1984), a case which held that, as to employment contracts between out-of-state employers and Michigan employees, a plaintiff could not enforce a no-compete clause in Michigan, even where the agreement provides for the application of another state's laws. Michigan's public policy against such covenants, according to the defendants, thus overrode an express choice-of-law provision. *Id.*

At the time of the *Comshare* decision, Michigan did, in fact, have a clear policy against no-compete agreements. Michigan had a statute which voided all non-compete agreements, whether reasonable or unreasonable. M.C.L. § 445.761 (1979). That statute,

---

8.   A executes and delivers to B in state X an instrument in which A agrees to indemnify B against all losses arising from B's liability on a certain appeal bond on behalf of C, against whom a judgment has been rendered in state Y.  The instrument recites that it shall be governed by the law of state Y.  It is valid and enforceable under the local law of Y but is unenforceable for lack of consideration under the local law of X.  In an action by B against A, the instrument will not be held invalid for lack of consideration.

however, was repealed in 1985, and was replaced with the current statute which provides:

> (1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.
>
> (2) This section shall apply to covenants and agreements which are entered into after March 29, 1985.

M.C.L.§ 445.774a.

Accordingly, the *Shipley* court found that as of 1985, Michigan could no longer be said to have a strong public policy against no-compete agreements.

The *Shipley* defendants argued, however, they executed the non-compete agreements before 1985 and that Michigan still has a strong policy against no-compete agreements that were entered into before 1985. As the court noted, the Michigan statute clearly provides that the new policy only applies to contracts made after March 29, 1985, and Michigan courts continue to void agreements that would have been void before the repeal of the old statute. But, as the *Shipley* court noted, this does not mean that enforcing a non-compete agreement would violate Michigan policy. The court explained:

> While defendants' argument has some force, it fails to recognize the critical distinction between Michigan's public policy and Michigan's law. If Michigan *law* were to apply, the covenants would be invalid, because the

contracts are pre-1985.  But here, we are applying Massachusetts'
choice-of-law rules.  Accordingly, the proper inquiry under Massachusetts
choice-of-law rules is whether Michigan has a fundamental *public policy*
that would be frustrated by the application of Massachusetts' substantive
law, and not whether a Michigan court would void the covenant pursuant to
a statute.  Michigan has expressed its current view that it is no longer
bothered by in-state restraints on competition imposed by reasonable
no-compete agreements.  Enforcement of the choice-of-law provision,
therefore, would violate Michigan *law*, but not Michigan *policy*.  It is only
the latter that is relevant here. Because Michigan no longer has a public
policy against no-compete agreements, therefore, defendants fail to satisfy
the first of the three conditions to qualify for the exception to the rule
enforcing choice-of-law provisions.

728 F. Supp. at 825-26 (footnote omitted; emphasis in original).

The precise issue of whether Texas policy would be thwarted by application of

another state's law governing covenants not to compete was addressed by the court in

*Intermetro Industries Corp. v. Kent*, 2007 WL 518345 (M.D. Pa. 2007).  As in this case,

in *Intermetro* the plaintiff filed an action to enjoin a former employee, Jonathan Kent, a

citizen of the State of Texas, from violating a one-year, nationwide covenant not to

compete, and a motion for preliminary injunctive relief to block Kent from working in

Texas with his current employer, a competitor of Intermetro.  The covenant not to

compete was embodied in an agreement that had a choice of law provision which

provided that the agreement would be governed by Pennsylvania law.  The defendant

argued, however, that the Pennsylvania choice of law provision should not be given

effect.

As Defendant Marzullo argues in this case, the defendant argued in *Intermetro* that

application of Pennsylvania law would be contrary to Texas policy because Pennsylvania

and Texas courts disagree on what constitutes sufficient consideration for a covenant not

to compete.  After examining the Texas statute and Texas case law -- specifically *Light*

and *Sheshunoff*, the same decisions relied upon by Defendant Marzullo here -- and the

Restatement (Second) of Conflict of Laws, including § 187(2)(b), comment g and

Illustration 8, the court rejected Defendant Kent's argument:

> That the Texas decisional law on the sufficiency of consideration for a restrictive covenant in an at-will employment context is *not* a matter of fundamental policy is illustrated by the Texas Supreme Court's holding in *Alex Sheshunoff Management Services v. Johnson*, 209 S.W.3d 644 (Tex. 2006).  In that recent decision, the Texas Supreme Court modified its ruling in *Light* by holding that a covenant not to compete is enforceable when an employee also agrees not to divulge confidential information, the employer promises to furnish the at-will employee with confidential information and specialized training, *and* the employer performs on its promise after the contract is formed, thus making the non-compete provision ancillary to an otherwise enforceable agreement.  *Id.* at 650-55.  In reaching this result, the court declared that it now "disagree[d] with language in *Light* stating that the Covenants Not to Compete Act requires the agreement containing the covenant to be enforceable the instant the agreement is made."  *Id.* at 646.  The Court further observed that the aim of the Texas legislature in enacting the Covenants Not to Compete Act was to *promote* enforcement of non-compete provisions in the at-will employment context, *id.* at 652, explaining that "in 1993, the Legislature specifically wanted to make clear that covenants not to compete in the at-will employment context were enforceable."  *Id.* at 654.  The court embraced the aim of the legislature by stating:

> > We also take this opportunity to observe that section 15.50(a) does not ground the enforceability of a covenant not to compete on the overly technical disputes that our opinion in *Light* seems to have engendered over whether a covenant is ancillary to an otherwise enforceable agreement.  Rather the statute's core inquiry is whether the covenant "contains

limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code § 15.50(a). Concerns that have driven disputes over whether a covenant is ancillary to an otherwise enforceable agreement -- such as the amount of information the employee has received, its importance, its true degree of confidentiality, and the time period over which it is received -- are better addressed in determining whether and to what extent a restraint on competition is justified. *We did not intend in Light to divert attention from the central focus of section 15.50(a). To the extent our opinion caused such a diversion, we correct it today.*

*Id.* at 655-56.

Thus, the Texas Supreme Court has made clear that fundamental policy of Texas supports enforcement of reasonable non-compete provisions in the at-will employment context. This recent opinion also poignantly illustrates the wisdom of not basing determinations of what constitutes "fundamental policy" on case law that attempts to delineate the parameters of adequate consideration or the degree to which a clause is ancillary to an employment contract.

Application of Pennsylvania law in this case will not contravene the fundamental policy of Texas concerning covenants not to compete in the at will employment context. As noted above, there is a strong basis for concluding that the Texas legislature *intended* a promise to employ a person on an at-will basis to constitute adequate consideration for a covenant not to compete. *See* Tex. Bus. & Com. Code Ann. § 15.51(b); Jeffrey W. Tayon, *Covenants not to Compete in Texas: Shifting Sands from Hill to Light*, 3 Tex. Intell. Prop. L.J. 143, 147, 149 (1995). That Texas courts might not find Mr. Kent's restrictive covenant enforceable does not suggest that a fundamental public policy would be damaged were the covenant found enforceable under Pennsylvania law. . . . The central question is whether application of Pennsylvania law would cause a substantial erosion of the quality of protection afforded under the Texas statute. Here application of Pennsylvania law would not substantially erode the Texas legislature's intent in enacting its statute, as Pennsylvania courts apply standards for assessing covenants not to compete that are similar to

those set forth in the Texas statute.

2007 WL 518345 at **3-4 (emphasis in original; footnotes and some citations and internal punctuation omitted).

As the foregoing authorities demonstrate, Defendant Marzullo's void-for-lack-of-consideration-under-Texas-law argument does not establish that application of the parties' chosen Michigan law which would allow enforcement of the non-compete agreement would be contrary to a fundamental Texas policy.[8]

_____

[8] Although the Court need not decide whether the non-compete agreement would, in fact, be deemed invalid under Texas law for lack of consideration, Defendant's protestations notwithstanding, it appears to the Court that Texas courts would uphold the agreement. In *Staples, Inc. v. Sandler*, 2008 WL 4107656 (N.D. Tex. 2008), the defendant argued that Staples provided no consideration for a non-competition agreement beyond his continued employment and his compensation. However, the agreement recited that Staples "has entrusted and will entrust Employee with proprietary information, strategies, knowledge, customer relationships and know how which would be detrimental to the company if disclosed." Although this appeared in the prefatory recitals in the agreement, the court found that under *Sheshunoff* -- which held that if an "employer performs his promise [to disclose confidential information] under the agreement and a unilateral contract is formed, the covenant is enforceable if all other requirements under the Act [i.e, reasonable limitations as to time, geographical area, and scope of activity restrained] are met" -- these recitals demonstrated that sufficient consideration was provided by Staples to support the non-compete agreement. *See also*, *Rimkus Consulting Group, Inc. v. Cammarata*, 2008 WL 3833717 (S.D. Tex. 2008) (promise to provide employee "access to" confidential information which was performed before employee left the company was sufficient consideration to support a covenant not to compete); *Beasley v. Hub City Texas, L.P.*, 2003 WL 22254692 (Tex. App. 2003) (where employment agreement stated that employee "will be granted access" to confidential information, the court held that employee's acknowledgment of the same, by signing the agreement, constituted an implied promise to provide confidential information).

Both the Non-Compete and the Confidentiality/Non-Solicitation Agreements in this case contain similar recitals of the performance of promises by the employer: "I acknowledge that substantial cost and expense has been or will be incurred by the

However, even if the Court were to find that Texas has such a fundamental policy, pursuant to the Restatement (Second) of Conflict of Laws § 187(2)(b), it is only when "application of the law of the chosen state would be contrary to a fundamental policy of *a state which has **a materially greater interest** than the chosen state* in the determination of the particular issue" that a choice of law provision will not be given effect. The record here does not establish that Texas has a "materially greater interest" than Michigan in this matter.

Defendant Marzullo is a resident of Texas who worked for Kelly, a Michigan company, in Texas. Admittedly, Texas, therefore, has some interest in this litigation. However, as Plaintiff pointed out in its Reply Brief, and as the Court noted at the November 6, 2008 hearing, Michigan's interests are substantial:

- Marzullo entered into and had a ten (10) year employment relationship with Kelly, a Michigan company.

- For more than three years, from March 2001 through July 2004, Marzullo lived and worked in Michigan for Kelly as an Area Manager.

- Marzullo served in a high-level position of Regional Manager/Vice President, which included managerial and operational duties, for the Michigan company.

---

Company for my training, and my training and employment has required or will require the disclosure of certain confidential information, trade secrets and customer relationships." Defendant does not dispute that Kelly did, in fact, provide him with training and confidential information. Thus, under Texas law, Marzullo's promise not to compete, as well as his confidentiality and non-solicitation promises are not illusory and the agreements were supported by sufficient consideration.

- Marzullo reported directly to, and corresponded on a regular basis with, the Vice President and Division Manager of Kelly, Kristin Supanich, who was and is located at Kelly's headquarters in Troy, Michigan.

- Marzullo admittedly traveled from Texas to Michigan on numerous occasions in the course of his job duties after he moved to Texas.

- Marzullo accessed and utilized Kelly's confidential information and trade secrets, much of which are housed on computer servers located in the Troy, Michigan headquarters.

In sum, as the Court observed at the November 6, 2008 hearing, the entire employment relationship between Marzullo and Kelly was rooted in Michigan. Undeniably, the harm here would be felt in Michigan, by a Michigan-based company. By contrast, the only facts in support of the notion that Texas has any interest in this matter are that Marzullo currently lives in that State and works for a competitor there.

Furthermore, Kelly, as a national and international employer, requires certainty in defending its rights in suits with its employees all over the country. As the court found in *Lowry*, *supra,* this is a significantly reasonable basis for enforcing the parties' contractual choice of law.

In sum, for the foregoing reasons, the Court concludes that the Michigan choice of law provision is enforceable and Michigan law, accordingly, will be applied in deciding this dispute.

B.    STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

In deciding whether a plaintiff is entitled to a preliminary injunction, the court is to

consider four factors:

> (1)    The likelihood of plaintiff's success on the merits; and
>
> (2)    Whether the injunction will save the plaintiff from irreparable injury;
>
> (3)    Whether the injunction will harm others; and
>
> (4)    Whether the public interest will be served by the injunction.

*Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995).  *See also, Superior Consulting Company, Inc., v. Walling, supra*, 851 F. Supp. at 846.  These factors should be balanced and are not considered prerequisites that must be met.  *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992).  "These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements."  *Id.*

1.    <u>LIKELIHOOD OF SUCCESS ON THE MERITS</u>

There is no serious dispute that Defendant Marzullo violated the Non-Competition Agreement.  He is working as a Regional Vice President for a competitor of his former employer and is performing the same services and serving the same market area that he worked in while employed by Kelly.  Under Michigan law, covenants not to compete are enforceable as long as they are reasonable.  *Rehmann, Robson & Co. v. McMahan*, 187 Mich. App. 36, 46; 466 N.W.2d 325 (1991), *app. denied*, 438 Mich. 857 (1991).

M.C.L. § 445.774a (1) provides as follows:

> An employer may obtain from an employee an agreement or

covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

M. C. L.§ 445.774a (1).

Further, an agreement is enforceable even if some of its terms are found to be unreasonable by the Court. See, *Rehmann, Robson & Co.*, *supra,* 187 Mich. at 46. The Court may enforce the Agreement to the extent the contract is reasonable by substituting reasonable terms for those omitted or found to be unreasonable. In this case, the Agreement entered into by Mr. Marzullo reasonably restricts his employment or line of business for a period of 12 months following termination of his employment with Kelly. Courts, applying Michigan law, have routinely upheld non-compete agreements restricting the former employee from engaging in restricted activities for periods of six months to three years. *See, e.g.*,"); *Bristol Window & Door, Inc. v. Hoogenstyn*, 250 Mich. App. 478, 650 N.W.2d 670 (2002) (enforcing a three-year, statewide non-competition agreement);*Lowry Computer Products, Inc. v. Head, supra*, 984 F. Supp. at 1116 (enforcing a one-year prohibition); *Superior Consulting Company, Inc. v. Walling, supra*, 851 F. Supp. at 847 (upholding six-month time period). *See also*, *Robert Half International, Inc. v Van Steenis*, 784 F. Supp. 1263, 1274 (E.D. Mich. 1991). Here, the Agreement restricts Defendant Marzullo's employment activities for a period of one

year.  Under the above authorities, this one-year restriction is enforceable.

The standard for reasonableness of geographic limitations in restrictive covenants is whether they are no greater than reasonably necessary to protect an employer's legitimate business interests.  Here, the non-competition provisions of the Agreement only preclude Defendant Marzullo from working for a competitor within the geographic territory in which he worked while employed by Kelly in the three years prior to his termination of employment.  This territory was the State of Texas.  This restriction will not prohibit Marzullo from continuing in Roth's employ; rather, it only means he cannot work in one state.  He can still continue to service clients in Colorado.

In view of the above-stated case law, it is unmistakable that the Non-Competition Agreement between Defendant Marzullo and Kelly Services is legally enforceable.  The restrictions in this Agreement are reasonable under Michigan law as to time, geography and type of work.  As a result, it is clear that Kelly is likely to succeed on the merits of its case, thus making injunctive relief appropriate.

2.    IRREPARABLE INJURY

The second factor in determining whether to issue a preliminary injunction requires the Court to assess whether Kelly will suffer irreparable injury in the absence of an injunction.  In *Lowry, supra*, the court elaborated on the concept of irreparable injury as follows:

> The more confidential information defendant possesses and the higher the likelihood that defendant will pass that information on to [a competitor], the more the other preliminary injunction factors (particularly irreparable injury

and public interest) will weigh in favor of granting a preliminary injunction. **The loss of consumer good will and the weakened ability to fairly compete that would result from** disclosure of trade secrets and **the breach of a non-compete agreement does establish irreparable injury**.

984 F. Supp. at 1116. Similarly, the Sixth Circuit has expressly held that "[t]he loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Basicomputer Corporation v. Scott*, 973 F.2d 507, 511-512 (6th Cir. 1992).

The foregoing authorities demonstrate that if Defendant Marzullo is permitted to continue working for Kelly's competitor, Roth Staffing, in the Texas market he serviced with Kelly, his former employer will be irreparably harmed.

3. <u>HARM TO OTHERS</u>

The third factor in determining whether to issue a permanent injunction requires the Court to determine whether the balance of equities weighs in favor of the entry of the preliminary injunction.

In *Superior Consulting, supra*, the Court addressed the issue of harm that would be suffered by an employee who is held to his non-competition agreement finding that the harm to the plaintiff from not enforcing a non-compete agreement would outweigh the hardship imposed by enjoining the employee for working in his field of expertise for a competitor. In reaching this decision, the Court reasoned as follows:

> Enforcing the noncompetition agreement imposed on Walling the significant hardship of not being able to work in his field of expertise, except through a business of his own, for a period of six months. Though

26

> serious, this harm is finite.  If SCC suffered irreparable harm to its
> competitive position, the loss would be of incalculable quantity and
> duration.  Also, the injunction sought by SCC only prevented Walling from
> violating his freely entered contractual obligation to SCC.  While the
> hardship to Walling cause by issuing the preliminary injunction was not
> inconsiderable, the balance of hardships here titled in favor of SCC.

*Superior Consulting*, 851 F. Supp. at 848.

If an injunction is granted here, the Defendant will not be significantly harmed.

As indicated, Marzullo will only be precluded for working for Roth in the Texas market

for one year.  He can still work in the Colorado market and any other area where he did

not work for Kelly in the three years prior to his termination of employment.   Finally, it

bears noting that to the extent Marzullo suffers harm by not being able to compete in

Texas for one year, this is certainly a risk he calculated and undertook both when he first

signed the Agreement and when he decided to leave Kelly and go to work for a

competitor.

4.    UNDERLINE_PUBLIC INTEREST

Granting a preliminary injunction in the present case is also in the public interest.

While recognizing the general public policy disfavoring restraints on trade and

interference with a person's livelihood, this Court has previously held that "[t]he public

interest[] in. . . enforcing valid employment contracts weigh[s] in favor of issuing the

preliminary injunction." *Superior Consulting, supra*, 851 F. Supp. at 848; *See also,*

*Lowry, supra*, 984 F. Supp. at 1116 (finding the enforcement of non-competition

agreements in the public interest); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Ran*,

67 F. Supp. 2d. 764, 781 (E.D. Mich. 1999) (finding that the public has an important interest in the enforcement of contracts, explaining that if the court were to refuse to enforce the terms of the contracts entered into by the parties it would be undermining the legitimate business expectations of not only the parties in the case, but of all contracting parties.)

As noted above, Defendant Marzullo has already breached the Non-Competition Agreement he had entered into with Kelly Services, and given the competitive nature of Plaintiff's and Defendant's businesses, there is a substantial risk of further breaches. Moreover, the Michigan Legislature, by enacting M.C.L. § 445.774a, has expressly recognized the public's interest in enforcing non-competition agreements. Accordingly, the Court finds that the public interest supports granting an injunction.

In sum, after balancing the four factors, the Court finds that Plaintiff Kelly Services is entitled to the preliminary injunctive relief requested with respect to the Non-Competition Agreement.

C.     PLAINTIFF'S ALLEGATIONS OF "INEVITABLE DISCLOSURE" ARE INSUFFICIENT TO JUSTIFY AN INJUNCTION TO PRECLUDE DEFENDANT FROM VIOLATING VIOLATION THE CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

As for the Confidentiality and Non-Solicitation Agreement, Kelly Services admittedly has no evidence showing or suggesting that Marzullo has used or disclosed any confidential information or that he has solicited any Kelly clients or employees. However, Kelly anticipates that given Marzullo's position with one of its competitors, it

is inevitable that Marzullo will use or disclose Kelly's confidential information and trade secrets. Under the Michigan Uniform Trade Secrets Act, M.C.L. § 445.1901, *et seq*., "[a]ctual *or threatened* misappropriation [of trade secrets] may be enjoined." M.C.L. § 445.1903(1) (emphasis added). Misappropriation includes the disclosure or use of a trade secret without consent. M.C.L. 445.1902(b)(ii); *Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F. Supp. 2d 817, 821-822 (E.D. Mich. 2000).

In support of its "inevitable disclosure" argument, Kelly relies principally upon *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir.1995).[9] In *PepsiCo,* the plaintiff sought a preliminary injunction against a former employee who had signed a confidentiality agreement, to prevent him from divulging plaintiff's trade secrets or confidential information. The Seventh Circuit, applying the Illinois Trade Secrets Act, stated that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Id*. at 1269. In *PepsiCo*, the Seventh Circuit's decision to affirm the District Court's decision rested in significant part on the lower court's determination that the former employee's conduct evidenced a significant lack of candor, and proof of his willingness to misuse trade secrets. *Id*. at 1270.

The "inevitable disclosure" doctrine, however, has not been adopted by Michigan

_____

[9] Plaintiff also cites *La Calhene, Inc. v. Spolyar*, 938 F. Supp. 523 (W.D. Wis. 1996) (applying Wisconsin law) and *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405 (N.D. Iowa 1996) (applying Iowa law) as also demonstrative of the "inevitable disclosure" doctrine.

courts.  In *CMI International, Inc. v. Internet International Corp*., 251 Mich. App. 125, 649 N.W.2d 808 (2002), noting that no Michigan case has interpreted the MUTSA statutory provision concerning "threatened" misappropriation, the Michigan Court of Appeals discussed the "inevitable disclosure" theory, specifically, noting the *PepsiCo* decision, and held

> Even assuming that the concept of 'threatened misappropriation' of trade secrets encompasses a concept of inevitable disclosure, that concept must not compromise the right of employees to change jobs.  *See Hayes-Albion Corp. v. Kuberski*, 421 Mich. 170, 188, 364 N.W.2d 609 (1984). Accordingly, we hold that for a party to make a claim of threatened misappropriation, whether under a theory of inevitable disclosure or otherwise, the party must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets.

241 Mich. App. at 133-34, 649 N.W.2d at 813.

Because CMI offered no evidence of duplicity on the part of its former employee, Defendant Ruff, or Ruff's new employer, Defendant Internet, beyond Internet's employment of Ruff, the appellate court concluded that CMI did not establish a basis on which to claim inevitable disclosure.  Therefore, the court determined that no preliminary injunction was warranted, and summary disposition was appropriate.  *See also Computer Training & Support Corp. v. Graves*, 1999 WL 33435477 (Mich. App. 1999) (affirming trial court's denial of preliminary injunction based on a confidentiality/non-competition agreement where, although plaintiffs stated that defendant gained specialized knowledge and information through her employment with plaintiffs, they did not allege or present

evidence demonstrating that defendant used that knowledge to plaintiffs' detriment and the sole basis for plaintiffs' claim rested on a conclusory, unsupported statement that defendant, on information and belief, was using plaintiffs' confidential information and trade secrets. "It is well established that an injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjectural." *Id.* (quoting *Dunlap v. City of Southfield*, 54 Mich. App. 398, 403; 221 N.W.2d 237 (1974)).

Based upon the cited Michigan authorities, the Court concludes that Plaintiff should not be granted a preliminary injunction to enjoin Plaintiff from violating the Confidentiality and Non-Solicitation Agreement. Other than the fact that Marzullo went to work for a competitor, the only evidence of "duplicity" on the part of Marzullo offered by Plaintiff is the Affidavit statement of Tyler Eash, who conducted Marzullo's exit interview on behalf of Kelly. According to Eash, Marzullo told him that he was going to work for Roth, where he would be responsible for its West Coast operations, and that although the West Coast operations normally include Dallas, Texas, he would not have responsibilities for Dallas, given his non-compete obligations. [Eash Affidavit, ¶ 4.] Eash states that Marzullo added that he would need to move to either Orange County, California or Denver, Colorado, for his new position at Roth. *Id.*

Marzullo acknowledges that he told Eash in his exit interview that he was going to go to work for Roth. However, he states, "I was not 100% certain what my territory would be with Roth at the time of my resignation from Kelly, although I knew it might

ultimately include parts of Texas and Colorado. I did know it was possible I would have to relocate, and I communicated that to Mr. Eash." [Marzullo Affidavit, ¶ 6.]

The Court does not find that Marzullo's purported exit interview statements to be such evidence of a significant lack of candor and proof of his willingness to misuse confidential information so as to support a claim of "threatened" misappropriation of trade secrets under Michigan law. Marzullo's exit interview statements are a far cry from the defendant's six-months' worth of lies to his superiors and secret negotiations with the competitor which persuaded the appellate court in the *PepsiCo* case, upon which Plaintiff here so heavily relies, to conclude that the district court correctly determined that PepsiCo had a reasonable likelihood of success on its various claims for trade secret misappropriation and breach of a confidentiality agreement based upon an "inevitable disclosure" theory.

For these reasons, the Court will not enjoin Plaintiff from violating the Confidentiality and Non-Solicitation Agreement, at this time. Should Plaintiff obtain evidence in the future that Defendant is using or disclosing confidential information, or should Plaintiff learn between now and August 7, 2009 (i.e., within 12 months from the date of Marzullo's resignation from Kelly) that Marzullo is soliciting customers he sold or delivered services to during his last 12 months of employment with Kelly, Plaintiff may return to the Court and seek appropriate injunctive relief based upon the Confidentiality and Non-Solicitation Agreement.

<u>CONCLUSION</u>

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction **[Dkt. # 2]** is GRANTED, in part, and DENIED, in part. Plaintiff's Motion is GRANTED with respect to Defendant Marzullo's Non-Competition Agreement but DENIED, without prejudice, with respect to the Confidentiality and Non-Solicitation Agreement.

Accordingly,

IT IS FURTHER ORDERED that Defendant William Marzullo is hereby ENJOINED, for a period of 12 months from the date of this termination of employment with Plaintiff Kelly Services, Inc., from

> participating in the ownership or control of, acting as an employee, agent, or contractor of, or providing any services to, or for, Roth Staffing Companies, L.P., or any of its staffing divisions, or any other business that is engaged in the employee staffing and consulting services business, which includes, but is not limited to, direct placement, outplacement, outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, management services, vendor on-site, vendor management, and consulting services, or engaging in any activity that is competitive with Kelly Services, Inc., in Texas or any State within the United States, in which Defendant Marzullo had any responsibility, or conducted any business, on behalf of Kelly Services, Inc., in the three years prior to his termination of employment with Kelly.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike Defendant's Post Submission Brief **[Dkt. # 14]** is DENIED but Plaintiff's alternative Motion for Leave to File a Surreply is GRANTED.  The Court accepts as filed, the proposed Surreply Brief

attached as Exhibit A to this Motion.

s/Gerald E. Rosen
United States District Judge

Dated:  November 20, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 20, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager